**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KUWAIT INVESTMENT AUTHORITY,<br><br>               Plaintiff,<br><br>     v.<br><br>AMERICAN INTERNATIONAL GROUP, INC.,<br>MARTIN J. SULLIVAN, STEVEN J. BENSINGER,<br>JOSEPH CASSANO, ANDREW FORSTER, ALAN<br>FROST, DAVID HERZOG, and ROBERT LEWIS,<br><br>              Defendants. | No. 11-CV-8403 (LTS) (DCF) |
| OPPENHEIMER EQUITY FUND, INC.;<br>OPPENHEIMER VARIABLE ACCOUNT FUNDS;<br>PANORAMA SERIES FUNDS, INC.;<br>OPPENHEIMER MAIN STREET FUND, INC.;<br>OPPENHEIMER MAIN STREET SELECT FUND<br>f/k/a Oppenheimer Main Street Opportunity Fund;<br>OPPENHEIMER RISING DIVIDENDS FUND f/k/a<br>Oppenheimer Quest Value Fund, Inc.;<br>OPPENHEIMER GLOBAL ALLOCATION FUND<br>f/k/a Oppenheimer Quest Balanced Fund;<br>OPPENHEIMER CAPITAL APPRECIATION<br>FUND; OPPENHEIMER GLOBAL FUND;<br>OPPENHEIMER GLOBAL VALUE FUND;<br>OPPENHEIMER EQUITY INCOME FUND, INC.<br>f/k/a Oppenheimer Quest Capital Value Fund, Inc.;<br>and OFITC GLOBAL FUND,<br><br>             Plaintiffs,<br><br>     v.<br><br>AMERICAN INTERNATIONAL GROUP, INC.,<br>MARTIN J. SULLIVAN, STEVEN J. BENSINGER,<br>JOSEPH CASSANO, ANDREW FORSTER, ALAN<br>FROST, DAVID L. HERZOG, ROBERT LEWIS,<br>STEPHEN F. BOLLENBACH, MARSHALL A. | No. 12-CV-0523 (LTS) (DCF) |

COHEN, MARTIN S. FELDSTEIN, ELLEN V.
FUTTER, STEPHEN L. HAMMERMAN, RICHARD
C. HOLBROOKE, FRED H. LANGHAMMER,
GEORGE L. MILES, JR., MORRIS W. OFFIT,
JAMES F. ORR III, VIRGINIA M. ROMETTY,
MICHAEL H. SUTTON, EDMUND S.W. TSE,
ROBERT B. WILLUMSTAD, and FRANK G.
ZARB,

                    Defendants.

BRITISH COAL STAFF SUPERANNUATION
SCHEME; MINEWORKERS' PENSION SCHEME;
FÖRSTA AP-FONDEN; TAYSIDE
SUPERANNUATION FUNDS; INTERNATIONAL
FUND MANAGEMENT S.A.; DEKA
INTERNATIONAL S.A. LUXEMBURG; DEKA
INVESTMENT GmbH; and ETFLAB
INVESTMENT GmbH,

                    Plaintiffs,

        v.

AMERICAN INTERNATIONAL GROUP, INC.;
MARTIN J. SULLIVAN; STEVEN J. BENSINGER;
JOSEPH CASSANO; ANDREW FORSTER; ALAN
FROST; DAVID HERZOG; ROBERT LEWIS;
STEPHEN F. BOLLENBACH; MARSHALL A.
COHEN; MARTIN S. FELDSTEIN; ELLEN V.
FUTTER; STEPHEN L. HAMMERMAN; GEORGE
L. MILES, JR.; MORRIS W. OFFIT; JAMES F. ORR
III; VIRGINIA ROMETTY; MICHAEL H.
SUTTON; EDMUND S.W. TSE; FRANK G. ZARB;
PRICEWATERHOUSECOOPERS LLC;
CITIGROUP GLOBAL MARKETS INC.; CREDIT
SUISSE SECURITIES (USA) LLC; DEUTSCHE
BANK SECURITIES INC.; DOWLING &
PARTNERS SECURITIES, LLC; FOX-
PITT·KELTON COCHRAN CARONIA WALLER
(USA) LLC; JP MORGAN SECURITIES INC.;
KEEFE, BRUYETTE & WOODS, INC.; MERRILL

No. 12-CV-4555 (LTS) (DCF)

LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; and WACHOVIA CAPITAL
MARKETS LLC,

                            Defendants.

---

PACIFIC LIFE FUNDS and PACIFIC SELECT
FUND,

                          Plaintiffs,

       v.

AMERICAN INTERNATIONAL GROUP, INC.,
MARTIN J. SULLIVAN, STEVEN J. BENSINGER,
JOSEPH CASSANO, ANDREW FORSTER, ALAN
FROST, DAVID L. HERZOG, ROBERT LEWIS,
THOMAS ATHAN, STEPHEN F. BOLLENBACH,
MARSHALL A. COHEN, MARTIN S. FELDSTEIN,
ELLEN V. FUTTER, STEPHEN L. HAMMERMAN,
RICHARD C. HOLBROOKE, FRED H.
LANGHAMMER, GEORGE L. MILES, JR.,
MORRIS W. OFFIT, JAMES F. ORR III, VIRGINIA
M. ROMETTY, MICHAEL H. SUTTON, EDMUND
S.W. TSE, ROBERT B. WILLUMSTAD, and
FRANK G. ZARB,

                          Defendants.

No. 12-CV-6071 (LTS) (DCF)

TEACHERS RETIREMENT SYSTEM OF THE
STATE OF ILLINOIS,

                              Plaintiff,                          No. 13-CV-3377 (LTS) (DCF)

            v.

AMERICAN INTERNATIONAL GROUP, INC.,
MARTIN J. SULLIVAN, STEVEN J. BENSINGER,
ROBERT E. LEWIS, JOSEPH J. CASSANO,
ANDREW FORSTER, ALAN FROST, and DAVID
L. HERZOG,

                              Defendants.


THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA,

                              Plaintiffs,                         No. 14-CV-1270 (LTS) (DCF)

            v.

AMERICAN INTERNATIONAL GROUP, INC.,
MARTIN J. SULLIVAN, STEVEN J. BENSINGER,
JOSEPH CASSANO, ANDREW FORSTER, ALAN
FROST, DAVID L. HERZOG, ROBERT LEWIS,

                              Defendants.


**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT JOSEPH CASSANO'S MOTION TO DISMISS**


March 6, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 3

    A.    Cassano led AIGFP, a division of AIG, throughout the relevant period. ............... 3

    B.    Under Cassano's leadership, AIGFP increased its credit default swap portfolio and failed to disclose the risks. ........................................................................... 4

    C.    Cassano weakened internal controls, contrary to AIG's representations to the investing public, allowing him to alter the valuation of the CDS portfolio........... 6

    D.    AIG put Cassano forward to allay investor concerns about the CDS exposure. .... 7

    E.    Cassano resigned and AIG was forced to correct its prior disclosures................. 8

ARGUMENT ..................................................................................................................... 9

I.    PLAINTIFFS' EXCHANGE ACT CLAIMS ARE NOT BARRED BY 28 U.S.C. § 1658(B)(2)................................................................................................................ 9

II.    DEFENDANT CASSANO IS LIABLE FOR BOTH THE STATEMENTS HE MADE ORALLY AND THE STATEMENTS THE COMPANY MADE. ................... 11

    A.    Defendant Cassano does not dispute that he can be held liable for his own alleged misstatements. ...................................................................................... 11

    B.    Plaintiffs are entitled to rely on the group pleading doctrine to allege Cassano's involvement in the Company's misrepresentations............................ 12

        1.    Janus *is inapplicable because it does not apply to the actions of a corporate executive.* ................................................................................ 13

        2.    *The group pleading doctrine remains "alive and well" following* Janus. 14

        3.    *The reasoning in* City of Pontiac *applies to Cassano.* ............................. 16

CONCLUSION.................................................................................................................. 19

## **TABLE OF AUTHORITIES**

### CASES

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
    No. 13-CV-5586 VEC, 2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014) ................................... 16

*American Pipe & Construction Co. v. Utah*,
    414 U.S. 538 (1974) .......................................................................................................... 2, 10-11

*Camofi Master LDC v. Riptide Worldwide, Inc.,* No. 10 Civ. 4020(CM),
    2011 WL 1197659 (S.D.N.Y. Mar. 25, 2011) ........................................................................ 15

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    --- F. Supp. 3d ----, No. 12-CV-5329 SAS, 2014 WL 5334053 (S.D.N.Y. Oct. 20, 2014) ...... 18

*City of Pontiac General Employees' Retirement System v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)................................................................... 2, 13, 15-17

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395  (S.D.N.Y. 2011) ................................................................................... 16

*Ho v. Duoyuan Global Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012) .................................................................................... 18

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010) .................................................................. 2-3, 13, 18-19

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................................. 14-15

*In re Comverse Tech., Inc., Sec. Litig.*,
    543 F. Supp. 2d 134 (E.D.N.Y. 2008)..................................................................................... 10

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
    No. CIV.A. 05-1151 SRC, 2011 WL 3444199 (D.N.J. Aug. 8, 2011) ................................ 13-14

*In re Nevsun Res. Ltd.*,
    No. 12 CIV. 1845 PGG, 2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) ................................. 15

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621, 638 (S.D.N.Y. 2008) ............................................................................ 15

*In re Pfizer Inc. Sec. Litig.*,
    936 F. Supp. 2d 252 (S.D.N.Y. 2013)................................................................................. 13, 15

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013)..................................................................................... 15

*In re UBS AG Sec. Litig.*,
   No. 07 CIV. 11225 RJS, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .................................. 15

*Janus Capital Group, Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011) ....................................................................................... 2, 12-16, 18

*Sagez v. Global Agric. Investments, LLC*,
   No. 11-CV-3059-DEO, 2014 WL 3779072 (N.D. Iowa July 31, 2014) .................................. 15

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) ................................................................................................ 10

*Take-Two Interactive Software, Inc. v. Brant*,
   No. 06 Civ. 05279 (LTS), 2010 WL 1257351 (S.D.N.Y. Mar. 31, 2010) .............................. 10

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*,
   517 F.3d 104 (2d Cir. 2008) .................................................................................................. 9

## STATUTES

28 U.S.C. § 1658(b)(2) ........................................................................................................ 1, 9

Plaintiffs in these related actions respectfully submit this memorandum of law in opposition to Defendant Joseph Cassano's motion to dismiss, which was filed separately in each of the above-listed actions.[1]

## INTRODUCTION

In his motion, the senior executive responsible for AIG's credit default swap portfolio that brought AIG to its knees and resulted in an $85 billion government bailout attempts to limit his liability to only the (1) oral statements he made (2) within the five years preceding the filing of each complaint. This request is based on an incorrect application of the five-year requirement in 28 U.S.C. § 1658(b)(2) and ignores the group pleading doctrine, which provides that the written statements of a company are presumed to be written by the senior executives involved in the company's everyday business. Therefore, Cassano's motion should be denied.

First, adopting the arguments of the Defendants' Omnibus Motion to Dismiss filed by American International Group, Inc. ("AIG or the "Company"), Defendant Cassano misapplies the five-year provision in 28 U.S.C. § 1658(b)(2). For the reasons discussed in opposition to that separate motion (*see* Plaintiffs' Omnibus Opposition to Defendants' Joint Omnibus Motion to Dismiss on Timeliness Grounds, dated March 6, 2015 ("Omnibus Opp. Br.")), Plaintiffs' claims are timely, for two reasons. First, all Plaintiffs filed within five years of the relevant date for

---

[1] Plaintiffs have filed their own actions and opted out of the proposed settlement in *In re American Int'l Group, Inc. 2008 Securities Litigation*, No. 08-CV-4772 (S.D.N.Y.). The original complaint in *Kuwait Investment Authority v. American International Group, Inc.* ("*Kuwait*"), No. 11-CV-8403 (LTS) (DCF), was filed on November 18, 2011. The amended, operative complaint in *Kuwait* was filed on September 10, 2012 ("*Kuwait* Compl."). The original complaint in *Oppenheimer Equity Fund, Inc. v. American International Group, Inc.* ("*Oppenheimer*"), No. 12-CV-523 (LTS) (DCF), was filed on January 20, 2012. The amended, operative complaint in *Oppenheimer* was filed on June 26, 2012 ("*Oppenheimer* Compl."). The original complaint in *British Coal Staff Superannuation Scheme v. American International Group, Inc.* ("*British Coal*"), No. 12-CV-4555 (LTS) (DCF), was filed on June 11, 2012. The corrected, operative complaint in *British Coal* was filed on July 9, 2012 ("*British Coal* Compl."). The complaint in *Pacific Life Funds v. American International Group, Inc.* ("*Pacific Life*"), No. 12-CV-6071 (LTS) (DCF), was filed on August 8, 2012. The amended, operative complaint in *Pacific Life* was filed on January 20, 2015 ("*Pacific Life* Compl."). The complaint in *Teachers Retirement System of the State of Illinois v. American International Group, Inc.* ("*TRSI*"), No. 13-CV-3377 (LTS) (DCF), was filed on May 17, 2013 ("*TRSI* Compl."). The complaint in *Regents of the University of California v. American International Group, Inc.* ("*U.C. Regents*"), No. 14-CV-1270 (LTS) (DCF), was filed on August 6, 2013 ("*U.C. Regents* Compl.").

purposes of the statute.  Cassano's argument that he should not be held liable for misrepresentations made after he purportedly resigned in March 2008 ignores the fact that he remained on the AIG payroll and continued to work as a consultant for AIG at a rate of $1 million per month throughout the Relevant Period.  Second, regardless of when the five-year statute is deemed to commence, it was tolled from May 2008 through January 2015, in accordance with *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), during which time Plaintiffs were putative class members of the AIG Class Action.  Accordingly, even if the time period was measured from each individual misrepresentation, under *American Pipe* all Plaintiffs' claims are timely.  (*See* Section I, below.)

Nor can Cassano avoid liability by claiming that, under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), he is only liable for his own oral statements, and not the statements of the Company.   As the court in *City of Pontiac General Employees' Retirement System v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) explained, *Janus* merely dealt with whether *third parties* could be held liable for the statements of their clients—not whether corporate executives are responsible for the statements of the company.  Post-*Janus*, the group pleading doctrine continues to apply to hold an executive in charge of the division at the heart of the alleged fraud—like Cassano—liable as a "maker" of a statement, even where that executive did not sign the filing alleged to have contained misstatements or omissions.  (*See* Section II, below.)  Because the group pleading doctrine survives *Janus*, it should be applied here just as the Court did in the AIG Class Case, holding that the group pleading doctrine applied to make Cassano liable for statements made by the Company.  *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 529-30 (S.D.N.Y. 2010) [hereinafter "*AIG*"].

Cassano's motion should be denied in its entirety.

## STATEMENT OF FACTS

A.    <u>Cassano led AIGFP, a division of AIG, throughout the relevant period.</u>

Joseph Cassano was the Chief Executive Officer of American International Group Financial Products Corp. ("AIGFP") from January 2002 through March 2008 and previously served as its Chief Operating Officer and Chief Financial Officer.[2] *See generally AIG*, 741 F. Supp. 2d at 518, 520-24 (describing Cassano's position and role).  Cassano and the other named Defendants "exercised control over AIG and/or AIGFP during the relevant time period [March 16, 2006 through September 18, 2008] through the key roles they played in the Company's management and their direct involvement in its day to day operations, including its financial reporting and accounting functions, and therefore caused the Company to engage in the illegal conduct and practices complained of herein."[3]

AIGFP is a division of Defendant AIG.[4]  Founded as a joint venture between AIG and former investment bankers, AIGFP became an operating subsidiary of AIG in 1993 when AIG terminated the joint venture.[5]  AIGFP was originally founded to find new and different ways to exploit the use and development of financial derivatives—contracts used to mitigate the risk of economic loss arising from changes in the value of the underlying assets.[6]  By the time Cassano took over as CEO in 2002, AIGFP was a $1 billion operation with 225 employees and hundreds

---

[2] *See* Def. Joseph Cassano's Mem. of Law ISO Mot. to Dismiss Plaintiffs' Complaints, dated January 20, 2015 ("Cassano Br.") at 3; *see also Kuwait* Compl. ¶ 44 (referring to Cassano as the President of AIGFP throughout the relevant period); *Oppenheimer* Compl. ¶ 48; *British Coal* Compl. ¶ 36; *Pacific Life* Compl. ¶ 39; *TRSI* Compl. ¶ 56; *U.C. Regents* Compl. ¶ 39.

[3] *Kuwait* Compl. ¶ 517; *Oppenheimer* Compl. ¶ 536; *Pacific Life* Compl. ¶ 528; *TRSI* Compl. ¶¶ 60, 366; *U.C. Regents* Compl. ¶ 529; *see also British Coal* Compl. ¶ 380.

[4] *Kuwait* Compl. ¶ 54; *Oppenheimer* Compl. ¶ 74; *British Coal* Compl. ¶ 61; *Pacific Life* Compl. ¶ 66; *U.C. Regents* Compl. ¶ 50.

[5] *Kuwait* Compl. ¶ 5-6; *Oppenheimer* Compl. ¶¶ 2-3; *British Coal* Compl. ¶ 3; *Pacific Life* Compl. ¶¶ 2-3; *TRSI* Compl. ¶ 69; *U.C. Regents* Compl. ¶ 5.

[6] *Kuwait* Compl. ¶ 5-6; *Oppenheimer* Compl. ¶ 2; *British Coal* Compl. ¶ 3; *Pacific Life* Compl. ¶ 2; *TRSI* Compl. ¶ 69-70; *U.C. Regents* Compl. ¶ 4.

of billions of dollars in obligations.[7]   As the head of AIGFP, Cassano reported directly to

William N. Dooley, a senior vice president at AIG.[8]   However, according to the *New York Times*,

Cassano ran AIGFP "with almost complete authority, and with an iron hand."[9]

Cassano was highly paid as head of AIGFP, including a total of $67.8 million in salary

and bonuses during 2006 and 2007 alone.[10]   Even though he resigned as CEO of AIGFP in

March 2008, he continued to serve as a consultant to AIG through the end of 2008 and was paid

$1 million per month for his services.[11]   That $1 million per month contract was terminated in

connection with the Government's bailout of Defendant AIG; however, Cassano was allowed to

retain up to $34 million in unvested bonuses that had been awarded during his time with the

Company.[12]

B.     Under Cassano's leadership, AIGFP increased its credit default swap portfolio
       and failed to disclose the risks.

One of AIGFP's businesses was to offer a credit default swap ("CDS") in which it would

essentially insure a company's corporate debt in case of default.[13]   Around 2004, AIGFP began

doing CDS deals for collateralized debt obligations ("CDOs") backed by securities that included

---

[7] *Kuwait* Compl. ¶ 8; *Oppenheimer* Compl. ¶ 5; *British Coal* Compl. ¶ 68; *Pacific Life* Compl. ¶ 5; *TRSI* Compl. ¶ 81; *U.C. Regents* Compl. ¶ 7.

[8] *Kuwait* Compl. ¶ 96; *Oppenheimer* Compl. ¶ 121; *British Coal* Compl. ¶ 102; *Pacific Life* Compl. ¶ 113; *U.C. Regents* Compl. ¶ 96.

[9] *Kuwait* Compl. ¶ 95; *Oppenheimer* Compl. ¶ 120; *British Coal* Compl. ¶ 102; *Pacific Life* Compl. ¶ 112; *U.C. Regents* Compl. ¶ 95; *see also TRSI* Compl. ¶¶ 12, 232, 286-91 (describing Cassano's control over the division and management style).

[10] *Kuwait* Compl. ¶ 462; *Oppenheimer* Compl. ¶ 483; *British Coal* Compl. ¶ 336; *Pacific Life* Compl. ¶ 475; *U.C. Regents* Compl. ¶ 470; *see also TRSI* Compl. ¶¶ 9, 334.

[11] *Kuwait* Compl. ¶ 44; *Oppenheimer* Compl. ¶ 48; *British Coal* Compl. ¶¶ 248, 264, 320, 336; *Pacific Life* Compl. ¶ 39; *TRSI* Compl. ¶¶ 56, 339; *U.C. Regents* Compl. ¶¶ 39, 328, 470.

[12] *Id.*; *see also Kuwait* Compl. ¶ 462; *British Coal* Compl. ¶ 336; *TRSI* Compl. ¶¶ 56; *U.C. Regents* Compl. ¶ 470.

[13] *Kuwait* Compl. ¶ 7; *Oppenheimer* Compl. ¶ 4; *British Coal* Compl. ¶ 4; *Pacific Life* Compl. ¶ 6; *TRSI* Compl. ¶¶ 4-5; *U.C. Regents* Compl. ¶ 6.

mortgage bonds.[14]  These "multi-sector CDOs" often packaged together 100 or more securities

backed by mortgage, auto loans, and credit card receivables.[15]  Cassano personally oversaw the

"Assets/Credit" group of AIGFP, which issued the CDS contracts at issue.[16]

Under Cassano's leadership, AIGFP wrote approximately 220 CDS contracts in the 10

months between March and December 2005, which exceeded the number of CDS contracts

written between 1998 and March 2005.[17]  This expanded CDS activity dramatically increased

AIG's exposure to the residential mortgage market, including the subprime mortgage market.[18]

When the Company stopped writing CDS contracts on multi-sector CDOs at the end of 2005,

AIG was insuring about $80 billion of such CDOs, most of which were backed by subprime

mortgages.[19]

None of the risks of insuring these multi-sector CDOs were disclosed to the investing

public.[20]  Indeed, AIG's public disclosures during the relevant period barely mention CDS.[21]

Even though it was the risk associated with the multi-sector CDOs, in particular the subprime

mortgage market, that caused Cassano to end AIGFP's writing of such contracts in December

---

[14] *Kuwait* Compl. ¶ 9; *Oppenheimer* Compl. ¶ 6; *British Coal* Compl. ¶ 5; *Pacific Life* Compl. ¶ 6; *TRSI* Compl. ¶ 228(c); *U.C. Regents* Compl. ¶ 8.

[15] *Id*.

[16] *Kuwait* Compl. ¶¶ 98, 431, 445; *Oppenheimer* Compl. ¶¶ 123, 452, 466; *British Coal* Compl. ¶¶  88, 89, 90; *Pacific Life* Compl. ¶¶ 115, 444, 458; *TRSI* Compl. ¶¶ 85, 307; *U.C. Regents* Compl. ¶¶ 98, 439, 453.

[17] *Kuwait* Compl. ¶ 10; *Oppenheimer* Compl. ¶ 6; *British Coal* Compl. ¶ 70; *Pacific Life* Compl. ¶ 6; *TRSI* Compl. ¶ 5; *U.C. Regents* Compl. ¶ 8.

[18] *Id*.

[19] *Kuwait* Compl. ¶ 11; *Oppenheimer* Compl. ¶ 6; *British Coal* Compl. ¶ 70; *Pacific Life* Compl. ¶ 6; *TRSI* Compl. ¶ 234; *U.C. Regents* Compl. ¶ 8.

[20] *Kuwait* Compl. ¶¶ 17-20; *Oppenheimer* Compl. ¶¶ 10-13; *British Coal* Compl ¶¶ 84, 86; *Pacific Life* Compl. ¶¶ 10-13;  *TRSI* Compl. ¶¶ 2, 11; *U.C. Regents* Compl. ¶¶ 12-14.

[21] *Kuwait* Compl. ¶ 20; *Oppenheimer* Compl. ¶ 13; *British Coal* Compl. ¶ 86; *Pacific Life* Compl. ¶ 13; *U.C. Regents* Compl. ¶ 14.

2005, Cassano and AIG did nothing to disclose these risks to the public.[22]  To the contrary, they concealed these risks so that they could artificially inflate the Company's reported income and, as a result, their own compensation.[23]  The CDS portfolio that Cassano's AIGFP division was responsible for was one of the primary risks that led to the downfall of AIG, which eventually required an $85 billion Government bailout of AIG.[24]

C.    Cassano weakened internal controls, contrary to AIG's representations to the investing public, allowing him to alter the valuation of the CDS portfolio.

Since 2005, AIG had represented to the investing public that it was in the process of strengthening internal controls and addressing concerns raised by government investigations into accounting irregularities in the early 2000s.[25]  During this time, Cassano and a handful of others kept a tight rein on the origination, valuation and reporting functions related to the CDS portfolio within AIGFP, to the exclusion of key risk management and accounting personnel at AIGFP and AIG.[26]  Indeed, when AIGFP's vice president for accounting policy, Joseph St. Denis, was concerned about the CDS valuation process following a multi-billion dollar collateral call, Cassano told St. Denis that he was being deliberately excluded from the valuation process.[27]  Cassano's extensive control over AIGFP's valuation of the CDS portfolio allowed him to

---

[22] *Kuwait* Compl. ¶ 75; *Oppenheimer* Compl. ¶ 101; *British Coal* Compl. ¶ 87; *Pacific Life* Compl. ¶ 93; *TRSI* Compl. ¶¶ 308-11; *U.C. Regents* Compl. ¶ 77.

[23] *Kuwait* Compl. ¶¶ 92, 459-62; *Oppenheimer* Compl. ¶¶ 117, 480-83; *British Coal* Compl. ¶¶ 89, 93; *Pacific Life* Compl. ¶¶ 109, 472-75; *TRSI* Compl. ¶¶ 9, 332-40; *U.C. Regents* Compl. ¶¶ 92, 467.

[24] *Kuwait* Compl. ¶¶ 15-16, 19; *Oppenheimer* Compl. ¶¶ 9, 12; *British Coal* Compl. ¶ 135; *Pacific Life* Compl. ¶¶ 9, 12; *TRSI* Compl. ¶¶ 25, 31, 40-41; *U.C. Regents* Compl. ¶¶ 25-26, 184.

[25] *Kuwait* Compl. ¶ 23; *Oppenheimer* Compl. ¶ 15; *British Coal* Compl. ¶ 275; *Pacific Life* Compl. ¶ 15; *TRSI* Compl. ¶ 109; *U.C. Regents* Compl. ¶ 17.

[26] *Kuwait* Compl. ¶ 12; *Oppenheimer* Compl. ¶ 7; *British Coal* Compl. ¶¶ 9, 11, 13; *Pacific Life* Compl. ¶ 7; *TRSI* Compl. ¶¶ 56-60; *U.C. Regents* Compl. ¶ 9.

[27] *Kuwait* Compl. ¶¶ 24, 122-34; *Oppenheimer* Compl. ¶¶ 17, 145-57; *British Coal* Compl. ¶ 103; *Pacific Life* Compl. ¶¶ 17, 137-49; *TRSI* Compl. ¶¶ 12, 151, 268; *U.C. Regents* Compl. ¶¶ 18, 215.

conceal from the public how deteriorating market conditions were impairing CDS value.[28]  In

addition, even AIG's outside auditors, PwC, found that Cassano operated AIGFP so as to

insulate it from scrutiny by the risk management and accounting functions at AIG.[29]  In fact,

AIGFP was so insulated from the rest of the Company that it became the only source for

information regarding the CDS portfolio in the entire Company.[30]

D.    AIG put Cassano forward to allay investor concerns about the CDS exposure.

When the U.S. residential housing and mortgage markets began to collapse, AIG sought

to quell investor concerns about the potential impact on AIG's business, in part by presenting

Cassano as a voice of authority on these issues on behalf of the Company.[31]  For example, in an

August 9, 2007 conference call, Cassano reassured investors of the strength of the CDS portfolio,

explaining: "it is hard for us, without being flippant, to even see a scenario within any kind of

realm of reason that would see us losing $1 in any of those transactions."[32]

Cassano repeated these same assurances to investors on several occasions.  On AIG's

November 8, 2007, conference call, Cassano represented to investors that AIG had "plenty of

resources and more than enough resources to meet any of the collateral calls that might come

in."[33]  On December 5, 2007, Cassano emphasized at an investor meeting that AIG was "highly

---

[28] *Kuwait* Compl. ¶ 25; *Oppenheimer* Compl. ¶ 18; *British Coal* Compl. ¶ 103; *Pacific Life* Compl. ¶ 18; *TRSI* Compl. ¶ 293; *U.C. Regents* Compl. ¶ 19.

[29] *Kuwait* Compl. ¶ 97; *Oppenheimer* Compl. ¶ 122; *British Coal* Compl. ¶ 85; *Pacific Life* Compl. ¶ 114; *TRSI* Compl. ¶¶ 94, 186, 281-82; *U.C. Regents* Compl. ¶ 97.

[30] *Kuwait* Compl. ¶ 97; *Oppenheimer* Compl. ¶ 122; *British Coal* Compl. ¶ 85; *Pacific Life* Compl. ¶ 114; *TRSI* Compl. ¶ 186; *U.C. Regents* Compl. ¶ 97.

[31] *Kuwait* Compl. ¶ 21; *Oppenheimer* Compl. ¶ 14; *British Coal* Compl. ¶ 150; *Pacific Life* Compl. ¶ 14; *TRSI* Compl. ¶ 16; *U.C. Regents* Compl. ¶ 21.

[32] *Kuwait* Compl. ¶¶ 21, 275, 278(d); *Oppenheimer* Compl. ¶¶ 14, 301, 304(d); *British Coal* Compl. ¶ 207; *Pacific Life* Compl. ¶¶ 14, 293, 295(d); *TRSI* Compl. ¶¶ 10, 141; *U.C. Regents* Compl. ¶¶ 15, 477, 458.

[33] *Kuwait* Compl. ¶ 290; *Oppenheimer* Compl. ¶ 316; *British Coal* Compl. ¶ 224; *Pacific Life* Compl. ¶ 308; *U.C. Regents* Compl. ¶ 298; *see also TRSI* Compl. ¶155 (Cassano assuring investors during the same call that AIG had "limited exposure to the very, very problematic vintages").

confident that we will have no realized losses on these portfolios" and that it is "very difficult to see how there can be any losses in these portfolios."[34]  He went on: "Our fundamental analysis says this is a money good asset.  We would not be doing the shareholders any benefit by exiting this right now and taking that loss.  And over the average lives that you see us post for the maturity of these transactions, these losses will come back and these are money good instruments that we have."[35]  Despite his knowledge of the riskiness of the CDS contracts and the potential exposure AIG faced from the mortgage collapse, Cassano continued to reassure investors as to the strength of the CDS portfolio specifically.

E.     Cassano resigned and AIG was forced to correct its prior disclosures.

     Cassano's assurances were patently false.  While AIG had represented on December 5, 2007, that the market valuation loss on the CDS portfolio was between $1.4 and $1.5 billion, as estimated using AIGFP models that Cassano defended,[36] just two months later, on February 11, 2008, AIG acknowledged that the portfolio loss reached almost $6 billion.[37]  Two weeks after that, the loss had ballooned to $11.5 billion.[38]  In its 2007 Form 10-K, AIG eventually (and belatedly) disclosed that its controls over the valuation of the CDS portfolio "were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates on a

---

[34] *Kuwait* Compl. ¶¶ 22; *see also id* ¶¶ 297-300, 302, 308; *Oppenheimer* Compl. ¶ 15; *see also id.* ¶¶ 323-26, 328, 334; *British Coal* Compl. ¶ 230; *Pacific Life* Compl. ¶ 15; *see also id.* ¶¶ 315-18, 320, 326; *TRSI* Compl. ¶ 19, *see also id.* ¶¶ 141, 156; *U.C. Regents* Compl. ¶¶ 16, 305.

[35] *Kuwait* Compl. ¶ 299; *Oppenheimer* Compl. ¶ 325; *British Coal* Compl. ¶ 231; *Pacific Life* Compl. ¶ 317; *TRSI* Compl. ¶ 156; *U.C. Regents* Compl. ¶ 307.

[36] *Kuwait* Compl. ¶¶ 25, 142; *Oppenheimer* Compl. ¶¶ 18, 165; *British Coal* Compl. ¶¶ 16, 238; *Pacific Life* Compl. ¶¶ 18, 157; *TRSI* Compl. ¶ 156; *U.C. Regents* Compl. ¶¶ 19, 140.

[37] *Kuwait* Compl. ¶¶ 25, 142; *Oppenheimer* Compl. ¶¶ 18, 165; *British Coal* Compl. ¶ 238; *Pacific Life* Compl. ¶¶ 18, 157; *TRSI* Compl. ¶ 168; *U.C. Regents* Compl. ¶¶ 20, 149.

[38] *Kuwait* Compl. ¶¶ 25, 142; *Oppenheimer* Compl. ¶¶ 18, 165; *British Coal* Compl. ¶¶ 16, 238; *Pacific Life* Compl. ¶¶ 18, 157; *TRSI* Compl. ¶¶ 25, 174; *U.C. Regents* Compl. ¶ 20.

timely basis."[39]  On February 29, 2008, one day after the announcement that the loss on its CDS portfolio was seven or eight times higher than previously indicated, AIG announced Cassano's "resignation."[40]

## ARGUMENT

Defendant Cassano "expressly adopts and incorporates by reference" the facts and arguments made in the omnibus motion to dismiss filed by AIG.  (Cassano Br. 1.)  Those arguments fail here for the same reasons they fail with regard to AIG.[41]

Cassano's two additional arguments fail as well.  The first, regarding the application of 28 U.S.C. § 1658(b)(2), is no different than the arguments made in the omnibus brief and must fail for the same reasons.  (Cassano Br. at 8-11.)  The second separately argues that Cassano is only liable for his oral statements.  (*Id.* at 11-18.)  As discussed below, this argument does not immunize Cassano from liability for the multiple misstatements he made himself, relies on an inapposite decision, ignores the group pleading doctrine, and is based on an unrealistic, narrow reading of the facts.  *See generally Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) ("Court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party.").

## I.   PLAINTIFFS' EXCHANGE ACT CLAIMS ARE NOT BARRED BY 28 U.S.C. § 1658(b)(2).

For the reasons set forth in opposition to the omnibus brief filed by AIG, Plaintiffs' claims are timely.  (*See* Omnibus Opp. Br.)  The only unique spin on the argument raised by Cassano is that, with respect to Section 10(b) claims against him, it would be particularly

---

[39] *Kuwait* Compl. ¶ 23; *Oppenheimer* Compl. ¶ 16; *British Coal* Compl. ¶ 250; *Pacific Life* Compl. ¶ 16; *U.C. Regents* Compl. ¶¶ 159, 332.

[40] *See supra* note 11 and accompanying text.

[41] Plaintiffs expressly incorporate all points of law and argument advanced in opposition to the omnibus motion.  *See* Omnibus Opp. Br.

inappropriate to measure the five-year period from the date Defendants' fraud ended "since he resigned [from AIG] in March 2008." (Cassano Br. 11.) He is wrong.

As detailed above, despite "resigning" from the Company, Cassano continued to draw a salary of $1 million dollars per month to serve the Company through the remainder of the Relevant Period. (*See* Facts Section A.) This suggests involvement by Cassano sufficient to state a claim against him under the group pleading doctrine. At a minimum, fact discovery is appropriate to determine the extent of Cassano's involvement post-March 2008 in the day-to-day management of the Company's business. (*See* Part II, below (explaining group pleading doctrine).) Indeed, as this Court has recognized, it is best "to await further development of the record and of the parties' legal positions" before determining the timeliness of Plaintiffs' claims against Cassano to the extent they are based on misrepresentations made after his "resignation." *Take-Two Interactive Software, Inc. v. Brant*, No. 06 Civ. 05279 (LTS), 2010 WL 1257351, at *6 (S.D.N.Y. Mar. 31, 2010) (Swain, J.); *accord In re Comverse Tech., Inc., Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008). This is particularly true where Cassano continued to serve the Company, and was given a lucrative consulting contract for his involvement, suggesting he remained intricately involved in the Company's business.[42]

Plaintiffs' claims are also timely under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). For the reasons detailed in the opposition to the omnibus brief filed by AIG, it is appropriate to treat the Plaintiffs, as putative class members, as having had pending claims

---

[42] If discovery shows that Cassano was no longer involved in the business after his purported "resignation"—despite his continuing to collect $1 million per month from company—it would not serve to cut off liability because his false and misleading statements remained a part of the "total mix of information" throughout the Relevant Period. As detailed above, the series of omissions and misrepresentations did not end until the announcement on September 16, 2008 that a massive $85 billion government was required to prevent AIG's collapse and the stock was impacted accordingly. Thus, defendants' statements—including those made by Cassano—remained alive in the market, and part of the "total mix of information" from the point they were made until this correction occurred. *See, e.g., Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000) ("In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security . . . .").

against AIG and the other Defendants since the date the Class Complaint was filed.  Indeed,

because the Class Complaint is well within the five-year period of the alleged

misrepresentations, Cassano's "resignation" does not render him unique.  Accordingly,

Plaintiffs' claims against him are timely.

Finally, Cassano acknowledges that even if the Court were to agree with Defendants'

interpretation of the five-year period, four of the six Plaintiffs would still have timely claims

against him.  (Cassano Br. 10.)  Accordingly, this motion will not dispose of all claims against

him regardless of the outcome.

## II.   DEFENDANT CASSANO IS LIABLE FOR BOTH THE STATEMENTS HE MADE ORALLY AND THE STATEMENTS THE COMPANY MADE.

### A.   Defendant Cassano does not dispute that he can be held liable for his own alleged misstatements.

The complaints in these actions are replete with allegations related to Cassano's own

misstatements, i.e. statements that he made orally to the investment community.  For example,

Cassano does not dispute that he is responsible for the following statements regarding the lack of

risk to AIG:

- August 9, 2007:  "[S]ometimes I feel like it is hard to get this message across, but these [CDS] are very much handpicked.  We are very much involved in the process of developing the portfolios in which we are going to wrap and then picking the attachment points.  And people who have been willing to work with us in order to do that to create the value that they do in these underlyings.  And so the combination of the diversity, the combination of the underlying credit quality and then the stresses that we put it through to make sure that we can hit these marks, **it is hard for us, without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions**."[43]

---

[43] *Kuwait* Compl. ¶¶ 269, 275; *Oppenheimer* Compl. ¶¶ 295, 301; *British Coal* Compl. ¶ 207; *Pacific Life* Compl. ¶¶ 287, 293; *TRSI* Compl. ¶ 141; *U.C. Regents* Compl. ¶ 283 (emphasis added in each); *see also Kuwait* Compl. ¶¶ 276-77 (claiming "almost zero exposure" and saying "we see no issues at all emerging and we see no dollar of loss associated with any of that business in any reasonable scenario that anyone can draw"); *Oppenheimer* Compl. ¶¶ 302-03; *British Coal* Compl. ¶ 208; *Pacific Life* Compl. ¶¶ 294-95;  *TRSI* Compl. ¶ 141; *U.C. Regents* Compl. ¶ 284.

- November 8, 2007:  "[W]e have been husbanding our liquidity all through this very trying period, and we have plenty of resources and more than enough resources to meet any of the collateral calls that might come in."[44]

- December 5, 2007:  "[W]e are highly confident that we will have no realized losses on these [CDS] portfolios during the life of these portfolios."[45]

(*See* Cassano Br. 18.)  Notably, Cassano's statements are consistent with AIG's prior and contemporaneous misleading statements concerning its CDS portfolio in its public filings.  The CDS portfolio caused AIG significant losses and put AIG on the brink of bankruptcy—the Company was only saved by the government bailout.  Indeed, less than three months after the December 5, 2007 meeting, AIG increased its potential market valuation loss on the CDS portfolio by seven or eight times—from approximately $1.4 or $1.5 billion to $11.5 billion.[46]

B.   Plaintiffs are entitled to rely on the group pleading doctrine to allege Cassano's involvement in the Company's misrepresentations.

Cassano invokes the Supreme Court's *Janus* decision to argue that he cannot be held liable for the written misstatements and omissions of the Company, only those he made directly to the investor community himself.[47]  (Cassano Br. 11.)  Cassano's argument fails.  *Janus* is distinguishable on the facts of this case, and also because the decision does not abrogate the group pleading doctrine, a well-established principle that allows a corporate executive to be held responsible for the statements of a company.  Because the group pleading doctrine survives

---

[44] *Kuwait* Compl. ¶¶ 287, 290; *Oppenheimer* Compl. ¶¶ 313, 316; *British Coal* Compl. ¶ 224; *Pacific Life* Compl. ¶¶ 305, 308; *U.C. Regents* Compl. ¶¶ 16, 298, 317(d); *see also TRSI* Compl. ¶155.

[45] *Kuwait* Compl. ¶¶ 297; *Oppenheimer* Compl. ¶ 323; *Pacific Life* Compl. ¶ 315; *U.C. Regents* Compl. ¶ 305; *see also Kuwait* Compl. ¶¶ 298-300 (claiming "hysteria" and "misinformation" had distorted perceptions of the economic realities of the CDS portfolio); *Oppenheimer* Compl. ¶¶ 324-26; *British Coal* Compl. ¶ 230; *Pacific Life* Compl. ¶¶ 316-18;  *TRSI* Compl. ¶ 156; *U.C. Regents* Compl. ¶ 306.

[46] *Kuwait* Compl. ¶ 25; *Oppenheimer* Compl. ¶ 18; *Pacific Life* Compl. ¶ 18; *TRSI* Compl. ¶¶ 25, 174; *U.C. Regents* Compl. ¶ 20.

[47] Defendant Cassano argues that he cannot be held liable for the oral statements of others.  Cassano Br. 17-18.  For purposes of these actions, Plaintiffs do not seek to hold him liable for *oral* statements made by others at AIG.

*Janus*, it should be applied here for the same reasons it did when this Court denied a motion to dismiss in the Class Case.  *AIG*, 741 F. Supp. 2d at 529-30.

> 1.    *Janus is inapplicable because it does not apply to the actions of a corporate executive.*

In *Janus*, the Supreme Court declined to hold mutual fund investment advisor JCM liable for false statements in prospectuses of its client Janus Investment Fund.  113 S. Ct. at 2299.  The Supreme Court held that, because JCM and the Janus Investment Fund were legally independent entities, JCM did not "make" statements for Janus Investment Fund within the meaning of Rule 10b-5; rather, Janus Investment Fund spoke for itself.  *Id*. at 2304-05.  Despite "persuasive[]" arguments from plaintiffs and *amici* that "investment advisers exercise significant influence over their client funds," the Court rested its decision on the fact that "it is undisputed that the corporate formalities were observed."  *Id*. at 2304.  In short, the fact that JCM and the Janus Investment Fund were different entities was the lynchpin of the Court's analysis and decision; *Janus* did not reach the question of whether a company's own executives could be liable for the company's misrepresentations.

Courts in this District have emphasized that *Janus*'s holding spoke to "only whether *third parties* can be held liable for statements made by their clients."  *City of Pontiac*, 875 F. Supp. 2d at 374 (internal citations omitted; emphasis in original).  As Judge Rakoff explained in *City of Pontiac*, *Janus*'s "logic rested on the distinction between secondary liability and primary liability and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability."  *Id*.; *see also In re Pfizer Inc. Sec. Litig.*, 936 F. Supp. 2d 252, 269 (S.D.N.Y. 2013) (same); *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, No. CIV.A. 05-1151 SRC, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011)

(distinguishing *Janus* as a case where liability was sought from a "separate and independent entity").

Indeed, in explaining why the advisor was not liable for the statements of the fund, the Supreme Court explained, "[o]ne who prepares or publishes a statement on behalf of another is not the maker." *Janus*, 113 S. Ct. 2302.  Rather, as when "a speechwriter drafts a speech, the content is entirely in the control of the person who delivers it." *Id*.  In this case, when AIG spoke—or failed to speak—about its CDS portfolio and its exposure to risk, Cassano was one of the handful of individuals in the Company with the ability to speak meaningfully on behalf of the Company.  Cassano was in charge of the unit responsible for the CDS portfolio, and weakened internal controls to allow himself to keep tighter control on its valuation.[48]  AIG also looked to Cassano to speak publicly about the Company's CDS portfolio and quell investor concerns— Cassano spoke on multiple investor calls as the person with knowledge.[49]  Cassano was not merely a draftsman, as envisioned by *Janus*—he controlled the content of what was being said about the CDS portfolio under his management.  Thus, *Janus* is inapposite.

2.     *The group pleading doctrine remains "alive and well" following* Janus.

The group pleading doctrine "permit[s] plaintiffs, for pleading purposes only, to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (quotations and citation omitted) (applying doctrine to defendants who did not sign financial reports).  Rather than having to allege with specificity the

---

[48] *Kuwait* Compl. ¶¶ 12, 24-25; *Oppenheimer* Compl. ¶¶ 7, 17-18; *British Coal* Compl. ¶¶ 11, 70, 103-104; *Pacific Life* Compl. ¶¶ 7, 17-18; *TRSI* Compl. ¶¶12, 60, 232-233; *U.C. Regents* Compl. ¶¶ 18-19, 97.

[49] *Kuwait* Compl. ¶¶ 21-22, 290; *Oppenheimer* Compl. ¶¶ 14-15, 316; *British Coal* Compl. ¶¶ 15, 207, 224, 227, 228, 230, 322; *Pacific Life* Compl. ¶¶ 14-15, 308; *TRSI* Compl. ¶¶ 131, 133, 141, 155-56; *U.C. Regents* Compl. ¶¶ 16, 283-84, 298, 305-07, 317(d).

fraud under the rigors of Rule 9(b), the doctrine allows a pleading to survive a motion to dismiss based on the recognition that written statements by a company are the work product of all individuals involved with the everyday management of the business.  *See City of Pontiac*, 875 F. Supp. 2d at 373; *Camofi Master LDC v. Riptide Worldwide, Inc.,* No. 10 Civ. 4020(CM), 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011).

The Supreme Court's holding in *Janus* did not abrogate the group pleading doctrine; to the contrary, it is "alive and well [after *Janus*]" in this District.  *In re Nevsun Res. Ltd.*, No. 12 CIV. 1845 PGG, 2013 WL 6017402, at *11 n.5 (S.D.N.Y. Sept. 27, 2013) (alteration in original); *see also City of Pontiac*, 875 F. Supp. 2d at 374.  Several courts, including this Court, have recognized the doctrine's viability post-*Janus*.[50]  For example, in *City of Pontiac*, the court explained that, "[i]t is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to 'make' an SEC filing, such that a misstatement has more than one 'maker.'"  875 F. Supp. 2d at 374.  This Court agreed with the reasoning of *City of Pontiac* in *Pfizer*, *supra*, and other courts have reached the same conclusion regarding the doctrine's viability post-*Janus*.  *E.g.*, *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 477 & n.16 (S.D.N.Y. 2013) (Jones, J.); *In re Nevsun*, 2013 WL 6017402, at *11 n.5 (Gardephe, J.);  *Sagez v. Global Agric. Investments, LLC*, No. 11-CV-3059-DEO, 2014 WL 3779072 at *20 (N.D. Iowa July 31, 2014).[51]  Indeed, the plaintiffs in *Janus* would not have been

---

[50] Cassano limits his argument regarding the group pleading doctrine's viability to *Janus*.  Cassano Br. 12 n.11.  Other defendants have made similar arguments that the group pleading doctrine did not survive the passage of the PSLRA, and courts, including this Court, rejected that argument as well.  *See City of Pontiac*, 875 F. Supp. 2d at 373-74 (listing judges rejecting position); *see also In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 638 (S.D.N.Y. 2008) (Swain, J.) ("[T]his Court joins the others in this district that have held the group pleading doctrine is 'alive and well' following the passage of the PSLRA.").

[51] Cassano's argument that *Janus* abrogated the group pleading doctrine relies on *In re UBS AG Securities Litigation*, No. 07 CIV. 11225 RJS, 2012 WL 4471265, at *10 (S.D.N.Y. Sept. 28, 2012).  On this issue, it simply cannot be reconciled with *City of Pontiac*, 875 F. Supp. 2d 374, and the other authority cited above.  But, it bears noting that the individual defendants in *UBS* were not alleged to have made any misstatements.  2012 WL 4471265, at *10.  Contrast those facts to the situation here, where Cassano was the person AIG put up to quell the investment

15

able to rely on the group pleading doctrine because the defendants there were not corporate insiders.

### 3.  The reasoning in City of Pontiac applies to Cassano.

The facts presented in this case are analogous to *City of Pontiac*, where the court held— applying the group pleading doctrine—that plaintiffs had stated a claim against the executive in charge of the division at issue in the filings, even though the executive did not sign the filings or make any specifically attributable statements.  875 F. Supp. 2d at 374-75; *see also Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-5586 VEC, 2014 WL 6466994, at *8 (S.D.N.Y. Nov. 18, 2014) (allowing 10(b) claim to proceed against defendant who did not sign public filings at issue).[52]  There, as here, defendants argued that the executive could not be the "maker" of a statement because *Janus* distinguished between those with "ultimate authority" and those who may have provided the false or misleading information or participated in its drafting. *City of Pontiac*, 875 F. Supp. 2d at 373.  Judge Rakoff  rejected that argument, holding that because the executive was "in charge of the division whose misconduct was at the heart of plaintiff's claims" and was in a high position of leadership, it was appropriate to invoke the group pleading doctrine and presume that the high-level executive was a "maker" of the

---

community's concern about the CDS portfolio and where there are specific allegations of misrepresentations attributed to him.  Clearly, as CEO of AIGFP, and as his selection to speak for the Company shows, Cassano is exactly the type of corporate executive the group pleading doctrine should reach.  *See* below Part II.B.3.

[52] *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011), cited by Cassano, is inapposite.  In *City of Roseville*, the court did not find individual defendants to be makers of statements where they did not sign the statement and, importantly, were merely director-*nominees*.  Because they would only become directors upon completion of the IPO and there was "no indication" they had authority over the contents of the registration statement "aside from consenting to being listed as director-nominees," it would not make sense to find them makers of the statement.  Here, by contrast, Cassano was in charge of the AIG division responsible for the issues at the heart of the complaints.

statements.  *Id.* at 361, 374-375.[53]  The group pleading doctrine applies to Cassano for the same reasons.

First, Cassano was "in charge of the division whose misconduct was at the heart of plaintiff's claims."  *Id.* at 361.  As the head of AIG's AIGFP division, Cassano was the corporate executive in charge of the division that exposed AIG to the CDS risk.[54]  Not only was he responsible for the CDS portfolio and the risks associated with it, but he was responsible for improper valuation of that portfolio and the lack of controls over it.[55]

Second, the significance of his position at AIG is apparent from numerous factors. Cassano spoke publicly about the CDS portfolio on behalf of the Company, in particular when questions arose as to whether the CDS contracts exposed AIG to excessive risk.[56]  He was the Chief Executive Officer of the division responsible for the CDS portfolio, and the importance of his position is reflected in his compensation, which totaled tens of millions of dollars a year.[57] Of note, Cassano does not move against the Section 20(a) claims on the basis of lack of control. And any attempts to draw distinctions between AIGFP and AIG are unavailing—particularly

---

[53] The Court in *City of Pontiac* held that the individual defendant was the maker of a statement under the group pleading doctrine insofar as a statement related to her division.  875 F. Supp. 2d at 375.  At this point, it is unclear to what extent a similar limitation is appropriate with regard to Cassano.  The complaints include detailed allegations of collective control over a number of issues at the Company.  Only through discovery can it be determined if there were *any* misrepresentations that Cassano had absolutely no involvement in.  However, at the pleading stage, the group pleading doctrine gives the presumption to Plaintiffs and allows that discovery to take place.

[54] *Kuwait* Compl. ¶¶ 12, 44, 462; *Oppenheimer* Compl. ¶¶ 7, 48, 483; *British Coal* Compl. ¶¶ 9, 320, 336; *Pacific Life* Compl. ¶¶ 7, 39, 475 ; *TRSI* Compl. ¶ 56; *U.C. Regents* Compl. ¶¶ 19, 39, 470.

[55] *Kuwait* Compl. ¶¶ 24-25, 125-34; *Oppenheimer* Compl. ¶¶ 17-18, 148-57; *British Coal* Compl. ¶¶ 103,115-16, 122; *Pacific Life* Compl. ¶¶ 17-18, 140-49; *TRSI* Compl. ¶¶12, 81, 232-33; *U.C. Regents* Compl. ¶¶ 9, 17-18, 97, 215.

[56] *Kuwait* Compl. ¶¶ 21-22; *Oppenheimer* Compl. ¶¶ 14-15; *British Coal* Compl. ¶¶ 15, 224, 228, 230, 238; *Pacific Life* Compl. ¶¶ 14-15; *TRSI* Compl. ¶¶ 141, 156; *U.C. Regents* Compl. ¶¶ 16, 283-84, 298, 305-07, 317(d).

[57] *Kuwait* Compl. ¶ 462; *Oppenheimer* Compl. ¶ 483; *British Coal* Compl. ¶¶ 4, 336; *Pacific Life* Compl. ¶ 475; *TRSI* Compl. ¶ 334; *U.C. Regents* Compl. ¶ 470; Cassano Br. 3.

given that AIGFP was a division of AIG and AIG put Cassano up to speak to investors.[58]  *See AIG*, 741 F. Supp. 2d at 529-30 (finding group pleading applies to Cassano); *see also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, --- F. Supp. 3d ----, No. 12-CV-5329 SAS, 2014 WL 5334053, at *6 (S.D.N.Y. Oct. 20, 2014) (holding that statements could be made by multiple affiliates under group pleading doctrine).  Accordingly, it is appropriate to apply the group pleading doctrine at the pleading stage.

The fact that Cassano's oral statements to investors were entirely consistent with the Company's previous and contemporaneous written statements further indicates that he was involved in making those statements, and thus supports the application of the group pleading doctrine.  For example, AIG's 2005 and 2006 Form 10-Ks disclose nothing about the CDS risk,[59] which is entirely consistent with Cassano's 2007 statements that the CDS portfolio would not cause AIG a dollar of loss[60] and therefore posed no risk to AIG or its investors.  AIG's 2007 10-Q, issued the day before Cassano's statements on the August 9, 2007 investor call, claimed that the impact of the mortgage market was "not expected to be material" and would have only a "temporary" effect on shareholder equity.[61]

Senior executives like Cassano should not be allowed to hide behind the corporate form to avoid liability for the company's statements, especially where the information included in the

---

[58] *Kuwait* Compl. ¶¶ 6, 54; *Oppenheimer* Compl. ¶¶ 3, 74; *British Coal* Compl. ¶¶ 3, 60; *Pacific Life* Compl. ¶¶ 3, 66; *U.C. Regents* Compl. ¶¶ 7, 50.

Cassano's citations to *Janus* and *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 576 (S.D.N.Y. 2012), do not require a contrary result.  Those cases dealt with third parties:  investment advisors in *Janus* and an umbrella organization for *independent* public accounting firms in *Ho*.  By contrast, AIGFP is a "division" of AIG.

[59] *Kuwait* Compl. ¶ 20; *Oppenheimer* Compl. ¶ 13; *British Coal* Compl. ¶ 13; *Pacific Life* Compl. ¶ 13; *TRSI* Compl. ¶ 110; *U.C. Regents* Compl. ¶ 14.

[60] *Kuwait* Compl. ¶ 275; *Oppenheimer* Compl. ¶ 301; *British Coal* Compl. ¶ 207; *Pacific Life* Compl. ¶ 293; *TRSI* Compl. ¶ 141; *U.C. Regents* Compl. ¶ 283.

[61] *Kuwait* Compl. ¶¶ 263-65; *Oppenheimer* Compl. ¶¶ 289-91; *British Coal* Compl. ¶¶ 194-95; *Pacific Life* Compl. ¶¶ 281-83;  *U.C. Regents* Compl. ¶¶ 271, 290; *see also TRSI* Compl. ¶ 141.

company's statements is attributable to the executive's knowledge.  As it previously did in *AIG*,
the Court should hold that the group pleading doctrine applies to Cassano, and allow Plaintiffs'
claims against him relating to the Company's statements to stand. 741 F. Supp. 2d at 529-30.

## CONCLUSION

For the reasons set forth above, Defendant Cassano's motion to dismiss Plaintiffs' claims
should be denied.


Dated: March 6, 2015
      New York, New York

                        Respectfully Submitted,


                        **BOIES, SCHILLER & FLEXNER LLP**

                        By:    /s/_____
                                    Jonathan D. Schiller

                        BOIES, SCHILLER & FLEXNER LLP
                        575 Lexington Avenue, 7th Floor
                        New York, New York 10022
                        Tel:  (212) 446-2300
                        Fax:  (212) 446-2350
                        jschiller@bsfllp.com

                        *Attorneys for Plaintiff Kuwait Investment Authority*


**-additional signature page to follow-**

**SUSMAN GODFREY LLP**

By:      /s/_____
         Mark H. Hatch-Miller

560 Lexington Avenue, 15th Floor
New York, New York 10022
Tel:  (212) 336-8330
Fax:  (212) 336-8340
mhatch-miller@susmangodfrey.com

-and-

Stephen D. Susman
560 Lexington Avenue, 15th Floor
New York, New York 10022
Tel:  (212) 336-8330
Fax:  (212) 336-8340
ssusman@susmangodfrey.com

-and-

Harry P. Susman
1000 Louisisana Street, Suite 5100
Houston, Texas 77002-5096
Tel:  (713) 651-9366
Fax:  (713) 654-6666
hsusman@susmangodfrey.com

-and-

David D. Shank
901 Main Street, Suite 5100
Dallas, Texas 75202
Tel:  (214) 754-1935
Fax:  (214) 754-1933
dshank@susmangodfrey.com

*Attorneys for Oppenheimer Plaintiffs and Pacific
Funds and Pacific Select Fund Plaintiffs*

**-additional signature page to follow-**

20

**GRANT & EISENHOFER, P.A.**

By:     /s/_____
        Geoffrey C. Jarvis
        Jay W. Eisenhofer

485 Lexington Avenue
New York, New York 10017
Tel:  (212) 722-8500
Fax:  (212)336-8340
gjarvis@gelaw.com
jeisenhofer@gelaw.com

-and-

John C. Kairis
123 Justison Street
Wilmington, DE 19801
Tel:  (302) 622-7160
Fax:  (302) 622-7100
jkairis@gelaw.com

*Attorneys for British Coal Plaintiffs*

**-additional signature page to follow-**

21

**ROBBINS GELLER RUDMAN & DOWD LLP**

By:   /s/
       Theodore J. Pintar

Darren J. Robbins
Thomas E. Egler
Susannah R. Conn
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel:  (619) 231-1058
Fax:  (619) 231-7423
tedp@rgrdlaw.com
darrenr@rgrdlaw.com
tome@rgrdlaw.com
sconn@rgrdlaw.com

-and-

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, New York 11747
Tel:  (631) 367-7100
Fax: (631) 367-1173
srudman@rgrdlaw.com

*Attorneys for Plaintiff Teachers Retirement System of the State of Illinois*

**-additional signature page to follow-**

22

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**

By: /s/_____
   Michael J. Miarmi

Steven E. Fineman
Daniel P. Chiplock
Nicholas Diamand
Douglas I. Cuthbertson
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel:  (212) 355-9500
Fax:  (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com
ndiamand@lchb.com
dcuthbertson@lchb.com

*-and-*

Richard M. Heimann
Joy A. Kruse
Bruce W. Leppla
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
rheimann@lchb.com
jakruse@lchb.com
bleppla@lchb.com

*Attorneys for Plaintiff The Regents of the
University of California*

23